[Civ. No. 32726. First Dist., Div. Four. July 1, 1974.]

STATE FARM MUTUAL AUTO INSURANCE COMPANY,
Plaintiff and Appellant, v.
FRANCIS BROWN et al., Defendants and Respondents.

COUNSEL

Nagle, Vale, McDowall & Cotter and William D. McDowall for Plaintiff and Appellant.

Robert A. Seligson as Amicus Curiae on behalf of Plaintiff and Appellant.

Rodriguez & Hoffman and Leopold A. Rodriguez for Defendants and Respondents.

OPINION

**RATTIGAN, J.**—At pertinent times prior to the controversy involved herein, respondents Francis Brown and Mary Rose Brown were the named insureds in an automobile liability insurance policy issued them by appellant State Farm Mutual Automobile Insurance Company. The vehicle, identified in the policy as the "described automobile," was a 1965 Chevrolet owned by the Browns. On January 11, 1971, while respondent Mary Rose Brown was driving the Chevrolet, it was involved in a collision with an automobile operated by respondent Elsie Cloud. State Farm thereafter brought this action for declaratory relief against all three respondents, seeking a judgment to the effect that it did not insure the Browns at the time of the accident. At the close of State Farm's case in chief at a jury trial, the trial court granted respondent Cloud's motion for nonsuit. Although counsel for respondents Brown did not join in the motion, the ensuing judgment of nonsuit was entered "in favor of all defendants" (i.e., in favor of all of the present respondents). State Farm appeals from the judgment.

### The Pleadings

In its complaint, State Farm alleged the occurrence of the abovementioned accident on January 11, 1971; that respondent Cloud had commenced an action against the Browns, seeking damages for personal injuries sustained by her as a result of the accident; that the Browns claimed that State Farm insured them at the time of the accident under "a policy of insurance coverage," and had demanded that State Farm defend them in the Cloud action and indemnify them "on account of any verdict rendered against them" therein; that State Farm contended that "no policy of insurance issued by it provided defense, indemnification nor any other rights" to the Browns at the time of the accident; and that an actual controversy existed, between State Farm and all respondents, as to whether the Browns were insured by State Farm at that time and whether State

Farm was obligated in any respect pertaining to the accident.[1] The complaint concluded with a prayer for a declaratory judgment to the effect that State Farm did not insure the Browns as to the accident of January 11, 1971, and was not obligated to defend them in the Cloud action or to pay any judgment rendered against them as a result of the accident.

In the Browns' answer, they pleaded material admissions and denials and alleged that State Farm insured them at all pertinent times "against liability for and defense of personal injury or property damage action [sic] arising out of the use of said 1965 Chevrolet" by them, and prayed ". . . [the trial] . . . court declare that plaintiff [State Farm] provide [sic] insurance coverage to . . . [the Browns] . . . on the 1965 Chevrolet for the accident occurring on January 11, 1971, . . . [and] . . . to defend [sic] . . . [them] . . . in all actions arising out of and satisfying [sic] any liability derived therefrom . . ."

In respondent Cloud's answer, she pleaded material admissions and denials and concluded with a prayer which was substantially similar to the Browns', but which was specifically directed to her pending action against them arising from the accident of January 11, 1971.[2]

### Facts

As will appear in further detail herein, State Farm has contended at all times that its automobile liability insurance policy, under which it had insured the Browns prior to the accident of January 11, 1971, was no longer in effect on that date because the Browns had theretofore failed to renew it in that they had not paid the appropriate renewal premium in December 1970. The pertinent facts shown in State Farm's case in chief therefore commence with the inception of the original policy as follows:

According to the "Declarations" which commenced on page 1 of the original policy as received in evidence, its number was "6450 629-F19-05," the Browns were designated therein as the "Named Insured," and their 1965 Chevrolet was identified as the insured automobile. The "Dec-

---

[1] State Farm also named "ABC Company and XYZ Company" as fictitious defendants in the action and included them in the controversy by alleging that they insured respondent Cloud at the time of the accident, that they denied that the uninsured motorist coverage of their policy was "exposed" to her claims arising from the accident, and that State Farm disputed their position. This phase of the controversy is not involved on the appeal.

[2] Although the Browns and respondent Cloud in effect prayed for affirmative relief as stated here, they did so in their answers alone; none of them filed a cross-complaint seeking such relief.

larations" also showed that the policy was originally issued on December 19, 1967, and that it then covered the Browns for the "Policy Period" from December 19, 1967, to June 19, 1968.

On page 10 of the original policy (a continuation of the "Declarations" which commenced on page 1 thereof) it provided: "1. The policy period shall be as shown under 'Policy Period' [referring to page 1, where the policy stated that the original 'Policy Period' was from December 19, 1967, to June 19, 1968] and for such succeeding periods of six months each thereafter as the required renewal premium is paid by the insured on or before the expiration of the current policy period. The 'Policy Period' shall begin and end at 12:01 A.M., standard time at the address of the named insured as stated herein. The premium shown is for the policy period and coverages indicated on page 1."

State Farm's principal witness was Frank Avery, its "service superintendent" and custodian of its records. He testified to its policy-renewal procedures, and to other events and records pertinent herein, as follows:

State Farm sends each policy holder a "notice of premium due" approximately 30 days before the "due date" of the renewal premium: i.e., approximately 30 days before the expiration of the insured's current "Policy Period" as that period is defined in Declaration no. 1 (quoted *supra*). The Brown's original policy remained continuously in effect from its issuance on December 19, 1967, through December 19, 1970.[3]

In keeping with its regular procedure, and on November 18, 1970 (i.e., approximately 30 days before the end of the current "Policy Period" of the Browns' policy), State Farm mailed to them a notice entitled "Semiannual Premium Notice." This notice (1) identified their policy, (2) stated that "This is the only notice you will receive prior to date premium is due," (3) further stated that "Payment by due date continues this policy in force for six months," and (4) showed "12 19 70" (i.e., December 19, 1970) as the "Policy Due Date" and "$94.50" as the "Amount Due."[4]

On December 21, 1970, having received no payment from the Browns, State Farm mailed them an "Expiration Notice," which again showed December 19, 1970, as the "Policy Due Date" and "$94.50" as the

---

[3]December 19, 1970, marked the end of the Browns' sixth consecutive six-month "Policy Period." The fact that their policy remained in continuous effect through its first six "policy periods" imports that State Farm regularly sent them a "notice of premium due" at appropriate intervals, and that they made timely payments of each required renewal premium at or about the end of the first five "Policy Periods." These facts were fairly reached by oral stipulation announced at the trial.

[4]We hereinafter refer to this notice as the "Semiannual Premium Notice."

"Amount Due." The "Expiration Notice" also contained these statements (among others): "Your policy expired at 12:01 A.M. on due date"; "Payment within 10 days after due date will reinstate your policy as of the policy due date"; and "To have continuous protection make payment to the Company [State Farm] or a State Farm agent within 10 days after policy due date. If payment is not made within 10 days after due date, but is made in not less than 40 days, protection will be reinstated as of date payment is received by the Company, subject to established Company procedures."[5]

According to Avery, State Farm employs the "Expiration Notice" as a form of "reminder notice." Although the notice states that payment within 10 days will "reinstate" the policy, the 10-day interval is actually a "grace period" during which "[c]ontinuous coverage is afforded" and the policy does not "lapse."

On or about January 11, 1971, still having received no payment from the Browns, State Farm mailed them a notice to which Avery referred as a "final lapse notice." This notice again showed December 19, 1970, as the "Policy Due Date" and "$94.50" as the "Amount Due." It also bore the following printed message: "Dear Policyholder [¶] We regret that your insurance has expired because the premium has not been received. You may reinstate your insurance by sending us a remittance for the AMOUNT DUE within 40 days of POLICY DUE DATE. Upon receipt thereof in this office you will be advised the effective date of reinstatement. [¶] To apply for reinstatement of your insurance more than 40 days after due date, please see a State Farm agent. [¶] We hope that you will reinstate your policy. [¶] s/ [signature] STATE FARM INSURANCE."[6]

According to the trial judge's remarks during argument on the motion for nonsuit,[7] he clearly indicated that he granted the motion upon the

[5]We hereinafter refer to this notice as "the December 21 notice."

[6]We hereinafter refer to this notice as the "final lapse notice."
The narrative preceding this footnote does not include a summary of evidence (which appears in the record) as to whether or when the Browns received any of the three notices described, of the testimonial assertion by respondent Francis Brown that he made the required renewal premium payment to State Farm by mailing it prior to January 11, 1971, nor of State Farm's actions upon receiving the payment. For the reasons which appear hereinafter, these facts are not relevant to the issue whether State Farm's policy covered the Browns on January 11, 1971.

[7]The judge's remarks may be examined "for the purpose of discovering the process by which he arrived at his conclusion." (*Henderson* v. *Fisher* (1965) 236 Cal.App. 2d 468, 472 [46 Cal.Rptr. 173]. Cf. 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 230, pp. 4220-4221.)

bases that the situation was controlled by Insurance Code[8] section 651[9] and sections 660-662, inclusive;[10] that, irrespective of the Browns' failure to pay their renewal premium on or before the "Policy Due Date" of

[8]Unless otherwise indicated, all references herein to "the code," and all statutory references, are to the Insurance Code.

[9]Section 651 appears in chapter 9 of part 1 of division 1 of the code. It was originally enacted there in 1957 (Stats. 1957, ch. 723, § 1, p. 1931), and was augmented by a 1970 amendment (Stats. 1970, ch. 576, § 1, p. 1152) which took effect on November 23, 1970. (*Id.*, vol. I, p. A-3.) As thus pertinent to the present controversy in point of time, the section provides (with the 1970 amendment shown in italics): "651. Notwithstanding any other provision of this code, no cancellation by an insurer of an auto liability insurance policy, *other than one defined in and subject to the provisions of Chapter 10 (commencing with Section 660) of this part,* shall be effective prior to the mailing or delivery to the named insured at the address shown in the policy, of a written notice of the cancellation stating when, not less than ten (10) days after the date of such mailing or delivery, the date the concellation shall become effective."

[10]These sections appear in "Chapter 10 (commencing with Section 660) of this part" to which reference is made in section 651 as amended in 1970 (see fn. 9, *ante*): i.e., in chapter 10 of part 1 of division 1 of the code. Although the trial judge mentioned only sections 660, 661 and 662 in his remarks on the motion (see fn. 7, *ante*), section 663 is necessarily involved. (Section 663 also appears in chapter 10; we hereinafter refer on occasion to the four sections, collectively, as "chapter 10.") As effective here in point of time, the aforementioned sections provide (in full or in pertinent part as indicated, with italics and bracketed materials added):

■ "660. As used in this chapter [i.e., in chapter 10 as mentioned above]: (a) 'Policy' means an automobile liability, automobile physical damage, or automobile collision policy, or any combination thereof, delivered or issued for delivery in this state, insuring a single individual or individuals residing in the same household, as named insured, and under which the insured vehicles therein designated are of . . . [certain specified types, one of which includes the Browns' automobile] . . .

". . . . . . . . . . . . . . . . . . . . . . .

"(e) *'Renewal' or 'to renew' means the issuance and delivery by an insurer of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term;* provided, however, that any policy with a policy period or term of six months or less whether or not made continuous for successive terms upon the payment of additional premiums shall for the purpose of this chapter be considered as if written for a policy period or term of six months. Provided, further, that any policy written for a term longer than one year or any policy with no fixed expiration date, shall for the purpose of this chapter, be considered as if written for successive policy periods or terms of one year. Such policies may be terminated at the expiration of their respective policy periods upon giving 20 days' notice of cancellation prior to such anniversary date, and such cancellation shall not be subject to any other provision of this chapter.

"(f) *'Nonpayment of premium' means failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums on a policy, or any installment of such premium,* whether the premium is payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit."

December 19, 1970 (see text at fn. 4, *ante*), or within the 10-day "grace period" permitted by State Farm thereafter, their coverage continued in

■ "§ 661. (a) A notice of cancellation of a policy shall be effective only if it is based on one or more of the following reasons: (1) Nonpayment of premium; or (2) The driver's license or motor vehicle registration of the named insured or of any other operator who either resides in the same household or customarily operates an automobile insured under the policy has been under suspension or revocation during the policy period or, if the policy is a renewal, during its policy period or the 180 days immediately preceding its effective date.

"(b) This section shall not apply to any policy or coverage which has been in effect less than 60 days at the time notice of cancellation is mailed or delivered by the insurer unless it is a renewal policy.

"(c) Modification of automobile physical damage coverage by the inclusion of a deductible not exceeding one hundred dollars ($100) shall not be deemed a cancellation of the coverage or of the policy.

"(d) *This section shall not apply to nonrenewal.*"

■ "§ 662. No notice of cancellation of a policy to which Section 661 applies shall be effective unless mailed or delivered by the insurer to the named insured at least 20 days prior to the effective date of cancellation; provided, however, that where cancellation is for nonpayment of premium, at least 10 days' notice of cancellation accompanied by the reason therefor shall be given. Unless the reason accompanies or is included in the notice of cancellation, the notice of cancellation shall state or be accompanied by a statement that upon written request of the named insured, mailed or delivered to the insurer not less than 15 days prior to the effective date of cancellation, the insurer will specify the reason for such cancellation.

*"This section shall not apply to nonrenewal."*

■ "§ 663. No insurer shall fail to renew a policy unless it shall mail or deliver to the named insured, at the address shown in the policy, at least 20 days' advance notice of its intention not to renew. Such notice shall contain or be accompanied by a statement that upon written request made not later than one month following the termination date of the policy of the named insured mailed or delivered to the insurer, the insurer will notify the insured in writing, within 20 days of his request, the reason or reasons for such nonrenewal; provided, however, that notwithstanding the failure of an insurer to comply with this section, the policy shall terminate on the effective date of any other replacement or succeeding automobile liability insurance policy procured by the insured, with respect to any automobile designated in both policies. *This section shall not apply where the named insured has failed to discharge when due any of his obligations in connection with the payment of premiums for the policy, or the renewal thereof,* or any installment payments therefor, whether payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit. This section shall not apply in any of the following cases:

"(a) If the insurer has manifested its willingness to renew.

"(b) *In case of nonpayment of premium;* provided that, notwithstanding the failure of an insurer to comply with this section, the policy shall terminate on the effective date of any other insurance policy with respect to any automobile designated in both policies.

"(c) If the insured's agent or broker has secured other coverage acceptable to the insured at least 20 days prior to the anniversary date of the policy or termination of the policy period.

"Renewal of a policy shall not constitute a waiver or estoppel with respect to grounds for cancellation which existed before the effective date of such renewal."

force until such time as State Farm had brought about formal *cancellation* of their policy by mailing or delivering them written "notice of cancellation" in accordance with sections 651, 661 and 662 (see fns. 9 and 10, *ante*); that, State Farm having given no such notice on or before the date of the subsequent accident (Jan. 11, 1971), the policy and coverage were in effect when the accident occurred; and that State Farm was therefore to be nonsuited in its action for declaratory relief to the contrary.

State Farm contends that the policy "lapsed" by its own terms on December 19, 1970 (or not later than Dec. 29, 1970, upon which date the 10-day "grace period" expired), because the Browns failed to pay the renewal premium when due on December 19; that section 663 did not apply so as to extend the policy's coverage beyond either date mentioned because the Browns had "failed to discharge when due . . . [their] . . . obligations in connection with the payment of premiums for the policy, or the renewal thereof" as contemplated in the section (see § 663 as quoted at [4] in fn. 10, *ante*), in which case the section provides that it "shall not apply" (see *ibid.*); and that sections 661 and 662 were similarly inapplicable because the Browns' failure to make timely payment of the renewal premium amounted to a "nonrenewal" of the policy, by them, and sections 661 and 662 each provides that it "shall not apply to nonrenewal." (See [2] and [3] in fn. 10, *ante*.)

State Farm also contends that the facts show no more than a "lapse" of the Browns' policy by reason of their failure to renew it upon the expiration of the term for which it was written; and that such "lapse" did not require a "notice of cancellation," pursuant to sections 651, 661 or 662, because it was not a "cancellation" within the meaning of those sections.[11]

Having reviewed the precise language of the statutes in question, and the legislative and judicial history of each, we agree with the trial court's conclusion; for the reasons next stated, we affirm the judgment.

(1) Section 663 Applied So As to Effect an "Automatic Extension or Renewal" of the Browns' Policy Beyond Its Renewal Date

It is undisputed that the Browns' automobile liability policy is a "policy" within the meaning of that term as defined in chapter 10. (See § 660,

---

[11]As authority for this distinction, State Farm cites the following language from *Farmers Ins. Exchange* v. *Vincent* (1967) 248 Cal.App.2d 534, 541 [56 Cal.Rptr. 775]: "In the ordinary sense of the terms, there is a difference between cancellation of a policy and its lapse by reason of the expiration of the term for which written. Cancellation implies a termination prior to the expiration of the term for which written."

subd. (a), quoted at [1] in fn. 10, *ante*.) ■ The plain language of section 663 (which appears in chapter 10 and which provides in pertinent part that "[n]o insurer shall fail to renew a policy" in the absence of its giving the insured a 20-day "notice of its intention not to renew": see [4], *ibid.*) imports that an insurer's failure to give such notice operates to effect an automatic renewal of the policy, beyond its renewal-expiration date and irrespective of the insured's nonpayment of the renewal premium payable on that date.

Interpretation of section 663 to this effect is commanded by a review of its historical context in light of the parallel history of section 651. At all times since its enactment in 1957 (see fn. 9, *ante*), section 651 has appeared in chapter 9 ("Rescission") of part 1 ("Contract of Insurance") of division 1 ("General Rules Covering Insurance"). As originally enacted, section 651 contained its present language except for the clause thereof which, as added in 1970, now refers to "Chapter 10 . . . of this part." (See fn. 9, *ante*.) There was no chapter 10 in part 1 in 1957; none appeared until 1965 when a "Chapter 10" (the predecessor of the one which presently appears in pt. 1) was enacted for the first time. (Stats. 1965, ch. 1716, § 1, p. 3850.)[12]

These enactments (i.e., § 651 in its original form and the 1965 version of ch. 10) were considered in the 1967 decision upon which State Farm relies in part. (*Farmers Ins. Exchange* v. *Vincent, supra,* 248 Cal. App.2d 534 at p. 541; see fn. 11, *ante*.) In *Vincent,* the insurer had mailed the insured a notice of cancellation of his automobile liability policy, which notice specified the "cancellation date" as the policy's forthcoming renewal date. (*Id.,* at p. 536.) In the insurer's action which followed the insured's involvement in an accident after that date (*id.,* at pp. 535, 537), the trial court found in the insurer's favor and entered a declaratory judgment accordingly. (*Id.,* at p. 535.)

Affirming the judgment upon the principal ground that there had not been a "cancellation" withing the meaning of section 651 as it currently

---

[12]The cited 1965 legislation enacted sections 660-664 (inclusive) under the heading "Chapter 10. Cancellation." Section 660 required the Insurance Commissioner to establish, by regulation, grounds upon which an insurer might cancel an automobile insurance policy. Section 661 required a cancelling insurer to state its grounds of cancellation to the insured in writing. Section 662 provided for an appeal to the commissioner by a cancelled insured. Section 663 exonerated an insurer and others from liability for statements made by any of them in the course of cancellation. Section 664 exempted "[c]ancellation for nonpayment of any premium" from the provisions of the new chapter 10, but did not define "nonpayment of any premium." (Stats. 1965, ch. 1716, § 1, p. 3851.)

read (*Farmers Ins. Exchange* v. *Vincent, supra,* 248 Cal.App.2d 534 at pp. 539-543), the appellate court made three points (among others) which are pertinent here. The first one cited the distinction, upon which State Farm relies in the present case, between "cancellation of a policy and its lapse by reason of the expiration of the term for which written. . . ." (*Id.,* at p. 541: see the full quotation in fn. 11, *ante.*)

Secondly, the *Vincent* court pointed out that, although section 651 appeared in a chapter entitled "Rescission," the 1965 version of chapter 10 was entitled "Cancellation" (see fn. 12 and accompanying text, *ante*), and section 6 precluded resort to either title in construing the content of the respective chapter,[13] the two chapters "must be held to be *in pari materia*": i.e., that they were to be construed together because they dealt with the same subject. (*Farmers Ins. Exchange* v. *Vincent, supra,* 248 Cal.App.2d 534 at pp. 541-542. See Black's Law Dict. (rev. 4th ed. 1968) p. 898 ["In Pari Materia"].)

The *Vincent* court's third point was expressed as follows: ". . . [I]n the instant case termination of coverage *at the stated end of the policy period* was not a *cancellation* within the meaning of section 651 . . . [¶] Section 381 . . . requires that a policy specify the period during which the insurance is to continue.[14] We have failed to find *any provision in the Insurance Code or elsewhere regarding automatic extension or renewal of insurance, . . .*" (*Farmers Ins. Exchange* v. *Vincent, supra,* 248 Cal.App.2d 534 at p. 543 [italics added].)

At its regular 1968 session which immediately followed the *Vincent* decision, the Legislature repealed former chapter 10 in its entirety (Stats. 1968, ch. 137, § 1, p. 352), enacted a new chapter 10 (under the heading "Chapter 10. Cancellation or Failure to Renew") which included present sections 660-663, inclusive, and most of the other sections which now appear in it (*ibid.,* § 2, p. 352 et seq.), amended section 663 as so enacted (Stats. 1968, ch. 595, § 1, p. 1266), and provided that all such 1968 enactments would take effect on January 1, 1969. (*Id.,* ch. 137 [p. 352], § 4, p. 355; *id.,* ch. 595 [p. 1266], § 4, p. 1267.)

[13]Section 6 provided in 1967, as it provides now, that "[d]ivision, part, chapter, article and section headings contained herein [i.e., in the Insurance Code] shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of any division, part, chapter, article or section hereof."

[14]Section 381 still so provides, in this language: "381. A policy shall specify . . . (e) The period during which the insurance is to continue. . . ." In the present case, it is undisputed that the Browns' policy specified that the insurance coverage was "to continue" until *at least* December 19, 1970.

As thus enacted and amended in 1968, section 663 included its present language that "[n]o insurer shall fail to renew a policy unless it shall mail or deliver to the named insured . . . at least 20 days' advance notice of its intention not to renew. . . ." (See [4] in fn. 10, *ante*.) From our construction of the quoted language in light of the *Vincent* decision which immediately preceded its enactment (see *Oakland Pav. Co. v. Whittell Realty Co.* (1921) 185 Cal. 113, 120 [195 P. 1058]), it readily appears that the Legislature intended to fill the statutory gap which the *Vincent* court noted in its third point quoted *supra*: i.e., that section 663 operates to effect an "automatic extension or renewal" (*Farmers Ins. Exchange* v. *Vincent, supra,* 248 Cal.App.2d 534 at p. 543) of an automobile liability policy in the absence of a 20-day notice by the insurer of its intention to the contrary. (*Accord*: Review of Selected 1968 Code Legislation (Cont. Ed. Bar 1968) p. 179 ["New § 663 requires the insurers [*sic*] to renew *automatically* unless it gives 20 days notice of its intention not to renew."] [Italics added].)

State Farm having sent to the Browns no such "notice of its intention not to renew," section 663 provided an "automatic extension or renewal" of their policy if the section otherwise applied according to its terms. As State Farm points out, the section provides (in the second sentence of its first paragraph) that it "shall not apply where the named insured has failed to discharge *when due* any of his *obligations* in connection with the payment of premiums for the policy, or the renewal thereof, . . ." (See its text as quoted at [4] in fn. 10, *ante; italics* added here.) It further provides, commencing with its third sentence, that it "shall not apply . . . (b) . . . [i]n case of nonpayment of premium." (See *ibid.*) The events thus defined are redundant as successively stated: the definition of each includes—and is limited to—that of the other because subdivision (f) of section 660 equates them in identical terms. (See [1], *ibid.*) Accordingly, whether section 663 applies here depends upon whether the Browns "failed to discharge *when due* . . . [their] . . . *obligations* in connection with the payment of premiums for . . . [their] . . . policy, or the renewal thereof."

Section 480 provides that "[a]n insurer is entitled to payment of the premium as soon as the subject matter insured is exposed to the peril insured against." The converse was necessarily true in the present case: i.e., State Farm was not *legally* "entitled" to payment of a renewal premium by the Browns *until* "the subject matter insured" was "exposed to the peril insured against." As this exposure had not occurred at any time prior to December 19, 1970, State Farm was not legally "entitled" to such payment until the renewed term had commenced thereafter. Section

663 therefore applied, with the "automatic" effect of commencing the Browns' renewed term, because they *theretofore* had no "obligations" which they could have "failed to discharge . . . in connection with the payment of premiums for . . . [their] . . . policy, or the renewal thereof, . . ."

  (2) Section 651 Applied So As to Require an "Effective" "Notice of Cancellation" As a Condition Precedent of the Discontinuance of State Farm's Coverage

By its express terms, and "[n]otwithstanding any other provision of this code" as stated among them, section 651 (appearing in ch. 9 of pt. 1 of div. 1 thereof) establishes that the transmittal of a 10-day "notice of the cancellation," to the insured, is a condition precedent of the insurer's "cancellation" of an "auto liability insurance policy, other than one defined in and subject to the provisions of Chapter 10." (See § 651 as quoted in fn. 9, *ante.*) The transmittal of such notice, as a condition precedent of effective cancellation of a policy by the insurer, is nowhere established in the present "Chapter 10" as enacted in 1968 (see *Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 662-663, fn. 4 [79 Cal.Rptr. 106, 456 P.2d 674); its pertinent sections prescribe only the permissible grounds of a "notice of cancellation" (§ 661, quoted at [2] in fn. 10, *ante*) and the manner and time in which the notice must be transmitted to the insured in order to be "effective" *as a notice.* (See § 662 as quoted at [3], *ibid.*)

However, chapters 9 and 10 must be read and construed together because they are *"in pari materia" (Farmers Ins. Exchange v. Vincent,* quoted *supra,* 248 Cal.App.2d 534 at pp. 541-542.) The statutory format which separates them has no effect except to distinguish between "rescission," as "retroactive termination" of an automobile liability policy, and "cancellation" as the "prospective termination" thereof. *(Barrera v. State Farm Mut. Automobile Ins. Co., supra,* 71 Cal.2d 659 at pp. 662-663, fn. 4.)

██ For these reasons, we conclude that, in enacting the 1970 amendment of section 651 as the latter appears in chapter 9 (see fn. 9, *ante*), the Legislature did not intend to exclude from the statute's overall effect an automobile liability policy "defined in and subject to the provisions of Chapter 10." Section 651 thus requires "written notice" as a condition precedent of an insurer's cancellation of a policy "defined in and subject to the provisions of Chapter 10," but subject to such provisions of that chapter which pertain to grounds of cancellation (§ 661) and the time and manner of transmittal of the required notice to the insured. (§ 662.)

### (3) Sections 661 and 662 Apply

Sections 661 and 662 provide, in the last sentence of each, that neither "shall . . . apply to nonrenewal." (See the text of each as quoted in [2] and [3] of fn. 10, *ante.*) ■ As used in each section, however, the term "nonrenewal" must be construed as a negative form of the term "[r]enewal," which is defined in subdivision (e) of section 660 as it appears in chapter 10. (See § 660, subd. [e] as quoted at [1] in fn. 10, *ante.*) As there defined in pertinent part, "[r]enewal" means the "issuance and delivery *by an insurer* of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer, or . . . [its] . . . issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term . . ." (Italics added.)

As used in chapter 10, therefore, the term "renewal" is an act to be performed by the *insurer,* "nonrenewal" is the *insurer's* omission to perform such act, and the *insured's* failure to renew does not fall within the term's definition. Accordingly, and contrary to State Farm's contention herein, the Browns' failure to pay their renewal premium (as billed to them in the "Semiannual Premium Notice": see fn. 4, *ante*) was not a "nonrenewal" within the meaning of sections 661 or 662. Each section therefore applied so as to require State Farm to comply with both by transmitting an "effective" notice of cancellation according to the terms of each.

Once State Farm had become "entitled" to the payment of a premium under section 480 as previously discussed, the Browns' "nonpayment" thereof was a valid ground upon which State Farm might have noticed a cancellation of the policy (§ 661, subd. (a), par. [1]: see [2] in fn. 10, *ante*) after an automatic renewal of the term thereof had been effected by the operation of section 663 (also as previously discussed). Failing the giving of such notice after the automatic renewal,[15] the policy continued in effect and was in effect on January 11, 1971.

The judgment is affirmed.

Caldecott, P. J., and Christian, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 28, 1974.

---

[15]No one contends, and it does not appear, that either the "Semiannual Premium Notice," the December 21 notice, or the "final lapse notice" (as successively sent to the Browns: see text at fns. 4, 5 and 6, *ante*) qualified as an "effective" "notice of cancellation" as contemplated and required by sections 661 and 662.